Filed 3/27/26  P. v. Bontemps CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084635 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS326700) |
| DONALD PAUL BONTEMPS III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy R. Walsh, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Collette C. Cavalier, Supervising Deputy Attorney General, Emily Reeves, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Donald Paul Bontemps III of seven counts of corporal injury on a dating partner (Pen. Code,[1] § 273.5, subd. (a); counts 2-4, 6-9) and three counts of assault with great bodily injury. (§ 245, subd. (a)(4); counts 5, 11, and 12.) The court found true allegations that the offenses involved a high degree of cruelty, viciousness, or callousness and the victim was particularly vulnerable. (Cal. Rules of Court, rules 4.421(a)(1) and (a)(3).) The court sentenced Bontemps to an aggregate term of 10 years in state prison.

Bontemps appeals, contending his conviction must be reversed because: (1) the trial court abused its discretion in allowing an expert witness to testify about intimate partner battering and its effects[2]; (2) the trial court erred in failing to sua sponte give CALCRIM No. 850, the limiting instruction on the use of such expert testimony; (3) his attorney was ineffective for failing to object to the expert testimony or request CALCRIM No. 850; and (4) the cumulative effect of these errors denied his right to due process.

We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Bontemps and V.G. began dating on and off starting in June 2021. In June 2022, when V.G. was about five months pregnant with their child, she

---

[1] Undesignated statutory references are to the Penal Code.

[2] Different terminology has been used to refer to this set of effects. Bontemps uses "intimate partner battering syndrome," while "battered women's syndrome" continues to appear in many opinions. (See, e.g., *People v. Morgan* (1997) 58 Cal.App.4th 1210, 1212.) But " 'intimate partner battering and its effects' is the more accurate and now preferred term." (*In re Walker* (2007) 147 Cal.App.4th 533, 536, fn. 1.) (See, e.g., Evid. Code, § 1107 [governing admissibility of expert testimony regarding "intimate partner battering and its effects"].)

moved in with Bontemps. In September V.G. returned to Michigan, where her family lived, to have the baby. Bontemps joined them in Michigan just before the baby was born. Their daughter was born in Michigan in October.

V.G. and the baby moved back in with Bontemps in January 2023. Her relationship with Bontemps was bad at the time. There was infidelity and yelling, and V.G. had thought about leaving. But she loved Bontemps and she wanted a household with two parents for their baby.

After she moved back in with Bontemps, things got "really tense quickly." Bontemps told V.G. he was not getting enough sleep due to the baby's crying, and he began getting frustrated with her. Bontemps would "flick" V.G.'s forehead and belittle her verbally, telling her that she was a "bad mom." He would ram his head against her head, and squeeze her cheeks hard. The violence escalated over the next several months. Bontemps pushed her to the ground, kicked her in the legs and stomach, hit her on her head with a shoe, punched her in the back of the head, grabbed her neck, twisted her fingers and hands, and strangled, choked, and slapped her.

She did not leave him because she hoped the "old Donnie" that she knew and fell in love with would come back. She wanted him to "be the dad [she] thought he could be." Bontemps never hurt their baby and was good with her.

V.G. took audio and video recordings of her injuries to show herself that she was not going crazy, since the way Bontemps acted "behind closed doors" was completely different from when they went to church or the laundromat together. She never reported him to the police because she did not want Bontemps to get in trouble, and she thought they could work through their issues. They still had good times together, but things could change from good to bad within a matter of seconds. Just before his arrest Bontemps was

3

assaulting her daily. Several times he strangled her to the point that she could not breathe, which scared her.

By March 2023, V.G. was making plans to leave. She applied for apartments in Michigan and attempted to save money until she could finish school in May 2023. She kept her plan a secret because Bontemps had previously told her she would never see their child again if she left.

For a while she did not tell anyone what was happening because it was embarrassing, but she eventually told two friends in April or May 2023.

V.G. continued to go to school and attempted to hide the bruising by wearing a hat with her hair down, wearing long sleeves, and tightening her hood around her face. She asked a classmate for makeup to cover up her injuries but did not tell her what was going on. Eventually one of her classmates learned about the reason for the bruising on her face and reported it to law enforcement.

When police first interviewed her in May 2023, V.G. still wanted to protect Bontemps so she told them things were fine and asked them to leave. Bontemps was arrested that same day.

At trial V.G. testified about physical attacks by Bontemps in February, March, April, and May 2023. She authenticated photos and videos she took of the resulting injuries, a video she recorded of one of the interactions with Bontemps, and multiple audio files of Bontemps berating and threatening her with violence.

Detective Federico Dominguez testified as an expert in domestic violence relationships. He received extensive training on investigating domestic violence and worked on over 6,400 domestic violence cases in his 10 years as a patrol officer and three years as a detective with the with the Chula Vista Police Department's family protection unit. Detective

4

Dominguez was not the assigned detective on Bontemps's case. He had not interviewed V.G. and he was not provided any information about the case.

Based on his training and experience, Detective Dominguez described different emotional responses exhibited by victims of domestic violence, which can include anger, confusion, and embarrassment. Some victims minimize what happened because they are in shock or do not want to admit that they allowed things to get as bad as they did. He said, by the time law enforcement gets involved, which, statistics show, is typically after there are least seven unreported domestic violence incidents, victims can direct their anger at law enforcement out of fear of what will happen to the children or to deflect attention away from the abuser. He stated that he was using statistics only for generalizations.

Detective Dominguez explained various myths and misconceptions of domestic violence, including that it is not always apparent that an individual is a perpetrator or victim of domestic violence. Domestic violence can impact individuals from a wide range of socioeconomic, cultural, religious, educational, or relationship backgrounds. It is not always the case that the perpetrator is male and the victim is female. Another myth is that the victim in a domestic violence relationship must have done something to deserve the abuse. This leads victims to underreport the violence, because a victim might believe that had they not acted in a certain way, they would not be a victim, and they need to get out of the situation themselves. A victim may stay in an abusive relationship due to finances, their living situation, children, their religious beliefs, their world views, or their familial beliefs.

Detective Dominguez described a diagram referred to as a "power and control wheel" used by law enforcement and victim advocates to understand and talk to victims about the dynamics that affect abusive relationships.

5

Power and control may be exercised through physical and sexual violence, intimidation, harm to property or pets, emotional abuse, isolating the victim, using children as bargaining pieces, an assumption that male privilege permits men to beat women, and economic abuse. In particular, emotional abuse could involve, for a female, name calling and degrading her about appearance or children, and for a male, belittling him for loss of a job or financial difficulties. Detective Dominguez testified that violence can escalate over time, with good days and bad days. He also described the cycle of abuse in an abusive relationship. He described two "prototypes" for the abuser: the "bulldog," who is domineering and always ready to attack, and a "viper", who is calm and quiet but can snap. In the cycle of abuse, tension between the individuals can escalate towards a violent outburst: then "[t]here's the bite from the bulldog; there's the bite from the viper." The outburst is followed by a "honeymoon phase," after which escalation resumes. The cycles often get faster and more violent.

Detective Dominguez discussed the ways in which victims may adapt to the cycle of violence by covering injuries with makeup, clothes or hairstyles, or taking up martial arts or other intense activities to have an explanation for bruising. He also noted that some victims attempt to collect evidence of their abuse or come up with plans to flee. It is common for victims to be unable to remember details of every incident of abuse.

The jury also heard from a friend of V.G.'s who received text messages from her about the abuse, and two classmates, one of whom made the report to law enforcement, who saw bruises on V.G. A forensic nurse testified as an expert in the mechanics of strangulation.

Bontemps testified in his defense at trial. He explained that V.G. frequently belittled him, accused him of cheating, and demanded to look at

his phone. V.G. would get physically aggressive with him. When she charged at him, Bontemps would grab her wrists, turn her around and hug her from behind to restrain her arms, and ask her to stop.

As to the specific charges, Bontemps recalled having an argument but not a physical altercation with V.G. on February 27, 2023. On March 23, Bontemps said V.G. struck him in the face and in response Bontemps grabbed her arms to restrain her. He got bruised on his eye, but he did not take any photos. He did not call the police because he did not want her to be separated from her child, and they were trying to deal with it themselves. On all of the other charged occasions, V.G. initiated the encounters by throwing objects at him or trying to strike or kick him. To restrain her Bontemps grabbed her wrists or arms and held her. He asked her not to hit him. He never intentionally put his hands or arms around her neck. The encounter on May 13, 2023, was similar; she got physical with him and he restrained her in the same manner.

V.G. showed him pictures she had taken of her injuries and said she could "bury [him]," which he took to mean he would be sent to jail and lose his daughter. He took extra 12-hour shifts at work to avoid being at home. He asked her to leave and offered to pay for her travel to the home of a friend, family member, or wherever she wanted to move.

The trial court instructed the jury regarding expert testimony with CALCRIM No. 332, which explained that "[t]he meaning and importance of any opinion" was for the jury to decide. The parties agreed to the set of jury instructions given. Neither the parties nor the court proposed CALCRIM No. 850, regarding intimate partner battering and its effects.

The jury returned verdicts of guilty on seven counts of corporal injury and three counts of assault; returned a not guilty verdict on one count of

corporal injury (count 1, dated February 27, 2023), and deadlocked on one count each of corporal injury and assault (counts 10 and 13, both dated May 13, 2023).

## DISCUSSION

I. *Failure to Object Forfeited Bontemps's Challenge to Admission of Intimate Partner Battering Evidence*

Bontemps contends the trial court abused its discretion by admitting the expert testimony because the expert improperly relied on statistical probabilities and covered irrelevant and prejudicial topics. The Attorney General contends that we should not consider this argument on appeal because Bontemps failed to object to the expert testimony at trial. Bontemps concedes that he failed to object. This claim was therefore forfeited.

Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was "timely made and so stated as to make clear the specific ground of the objection." (Evid. Code § 353, subd. (a).) Accordingly, a defendant's failure " 'to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable," and the defendant forfeits his claim on appeal that the trial court erroneously admitted the evidence. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21.) This principle applies equally to the admission of expert witness testimony. (*People v. Doolin* (2009) 45 Cal.4th 390, 448; *People v. Ward* (2005) 36 Cal.4th 186, 211.)

Since " ' " ' "[t]he law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them," ' " ' " Bontemps's failure to object forfeited this claim on appeal. (*People v. Aguirre* (2025) 18 Cal.5th 629, 706 n. 41.)

We consider, ante, Bontemps's claim that the failure to object amounted to ineffective assistance of counsel.

## II. *No Sua Sponte Duty by Court to Instruct*

Bontemps contends the court was obligated to instruct the jury sua sponte with CALCRIM No. 850, which limits the use of expert testimony on the effects of intimate partner battering. We disagree that the court was required to give a limiting instruction absent a request.

### A. *Legal Principles*

A claim of instructional error is reviewed de novo. (*People v. Thomas* (2021) 64 Cal.App.5th 924, 948.)

" ' "Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted." ' " (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1071-1074 (*Mateo*).) The Legislature imposes only one mandatory instruction on expert testimony, which is captured by CALCRIM No. 332. (§ 1127b.)[3] "No further instruction on the subject of opinion evidence need be given." (*Ibid.*)

### B. *Analysis*

The trial court complied with section 1127b by providing the jury with the pattern instruction on expert testimony found in CALCRIM No. 332.

---

[3] "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] No further instruction on the subject of opinion evidence need be given." (§ 1127b.)

Under the plain language of the final sentence of section 1127b, no further limiting instruction on the use of the expert testimony was required.

While *People v. Housley* (1992) 6 Cal.App.4th 947, 959 imposed a sua sponte duty to give a limiting instruction "in all cases" where an expert testifies about an analogous psychological syndrome, we agree with *Mateo, supra,* 243 Cal.App.4th at pages 1071-1074, that statutory and decisional law require the instruction be given only if requested. *Mateo* explained that *Housley* is "at odds with our Supreme Court's decision in [*People v. Humphrey* (1996)] 13 Cal.4th 1073," which held that the trial court had a duty to give a limiting instruction on intimate partner battering and its effects *on request*, and suggested that, even on request, "an instruction would be discretionary." (*Mateo,* at p. 1073; see *Humphrey,* at p. 1088, fn. 5 [an additional limiting instruction *might* be appropriate on request].)

We agree with *Mateo*'s analysis and conclude that a trial court does not have a sua sponte duty to give CALCRIM No. 850 when testimony on intimate partner battering and its effects is presented. Here, the trial court properly instructed the jury with CALCRIM No. 332, which complies with section 1127b's requirements. In the absence of a request from Bontemps, no further instruction on expert testimony was required, and the trial court did not err.

### III.  *Counsel Was Not Ineffective*

Bontemps contends his trial counsel was ineffective for failing to object to Detective Dominguez's testimony or request CALCRIM No. 850. Since Bontemps failed to demonstrate prejudice, we conclude his counsel was not ineffective.

10

A. *Legal Principles*

To establish ineffective assistance, an appellant must show (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

A reviewing court will indulge the presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. (*Strickland, supra,* 466 U.S. at p. 687.)

On appeal, if the record " ' "sheds no light on why counsel acted or failed to act in the manner challenged," ' " we must reject the claim of ineffective assistance of counsel " ' "unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." ' " (*People v. Caro* (2019) 7 Cal.5th 463, 488.)

" 'The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1197), and the " '[f]ailure to object rarely constitutes constitutionally ineffective legal representation.' " (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

B. *Analysis*

The record does not indicate why trial counsel did not object to the expert testimony or request CALCRIM No. 850. Consequently, Bontemps cannot prevail " 'unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

Conceivable tactical reasons exist for counsel's decision not to object to the testimony. Defense counsel knew he intended to attempt to neutralize Detective Dominguez's expert testimony with a very brief cross-examination.

11

Under defense counsel's questioning, the detective confirmed that he had closed investigations in the past after determining domestic violence accusations were unfounded. He testified that a victim's brain may block memories of events leading up to the alleged assault, which supported the defense's argument that V.G. failed to describe what she had done to initiate the fights with Bontemps. Defense counsel also elicited that Detective Dominquez knew nothing about the relationship between Bontemps and V.G.

Counsel urged the jury to rely on the credible and factual testimony of Bontemps, instead of the biased, speculative, and incomplete testimony of prosecution witnesses. Counsel argued in closing that the jury had heard few facts, except from Bontemps. He said Detective Dominguez "came in with a script" and "had statistics for everything that benefitted his position as a domestic violence expert, but couldn't seem to answer any challenges to it," such as statistics on the number of times the detective had found accusations unsupported or that a victim had lied. V.G. could not remember much; she would show a bruise and say it must have been Bontemps. In contrast, Bontemps "finally got to tell his side of the story." He was "largely consistent" with "fairly clear memories."

Moreover, despite the detective's bias, the expert testimony actually supported Bontemp's testimony, his counsel argued. If the jury reviewed the prosecutor's "domestic violence wheel," the jury would see Bontemps was a victim who was belittled and controlled by V.G. "By all means, please, take a look at that wheel and think about his testimony," counsel urged. (Cf. *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 [defense counsel was not ineffective where, instead of registering a contemporaneous objection, he made a tactical choice to undermine the prosecutor in his own closing remarks].)

As to the expert's use of the animal imagery, objecting to "bulldog" and "viper" may have only served to draw the jury's attention to these terms (see *People v. Planchard* (2025) 109 Cal.App.5th 157, 176 [defense counsel may make a tactical decision that "objection or other responses would serve only to highlight the undesirable testimony"]). Or, such an objection may have undermined counsel's plan to urge the jury to believe V.G. was the predatory abuser, not Bontemps, and that, by implication, those terms described her.

Similarly, a conceivable reason exists for the choice not to request CALCRIM No. 850: "competent counsel could rationally conclude that it would be counterproductive to request an instruction highlighting expert testimony supporting the victim's credibility." (*Mateo, supra,* 243 Cal.App.4th at p. 1076.) Counsel chose instead to emphasize Bontemps's credibility, upon which his defense relied.

Because conceivable reasons exist, we do not find Bontemps's counsel ineffective for opting not to object to the expert testimony or request CALCRIM No. 850.

Even if his counsel should have objected to the testimony,[4] Bontemps cannot meet his burden to prove he would have obtained a more favorable result had objections been made or CALCRIM No. 850 been given.

---

[4] We find aspects of the testimony troubling, particularly the expert's characterization of abusers as either a "bulldog" or a "viper." Use of such animal imagery is problematic and potentially prejudicial, whatever the circumstance or purpose. (See, e.g., *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077 [noting that the Racial Justice Act defines " ' "[r]acially discriminatory language" ' to include 'racially charged or racially coded language' and 'language that compares the defendant to an animal . . . .' " (§ 745, subd. (h)(4)]).

Bontemps contends that the expert recited statistics and probabilities, which "would have encouraged the jury to speculate that [Bontemps] had battered [V.G.] at least seven times before [he] was arrested by police." We do not view such speculation as likely to have occurred in this case.

First, the case Bontemps relies upon is inapposite. In *People v. Julian* (2019) 34 Cal.App.5th 878, 883, the expert testified that false allegations by a child of sexual abuse were rare, occurring between 1 and 8 percent of the time. Because the testimony conveyed that child victims were truthful up to 99 percent of the time, this probability evidence "invited jurors to presume [defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886.) Expert testimony on the likelihood that a prosecution witness was telling the truth invaded the province of the jury and deprived the defendant of his right to a fair trial. (*Ibid.*)

The expert in Bontemps's case offered no such statistical evidence about the likelihood of false allegations in domestic violence cases.[5] Instead, Detective Dominguez cited the statistic about seven prior unreported domestic violence incidents to explain why victims can react with anger and resist the involvement of law enforcement.

In any case, there was little risk that Bontemps's jury would speculate about whether unreported acts of domestic violence occurred, or convict on the charged counts based on suspicion that Bontemps had committed seven other unknown acts before his arrest. The entire trial concerned violent incidents prior to Bontemps's arrest that V.G. had never reported. V.G.

---

[5] Bontemps's counsel recognized this. In closing, counsel urged the jury not to believe Detective Dominguez's testimony in part because he could not answer questions about the number of times an abuse victim lies.

testified, and authenticated audio and video recordings, about charged offenses dated in February, March, April, and May 2023, all unreported acts occurring before Bontemps's arrest in May. In addition, the court permitted the prosecution to introduce evidence about a prior uncharged act of domestic violence under rule Evidence Code section 1109, subd. (a)(1). Thus, the expert testimony would not cause the jury to speculate about unreported acts of domestic violence; the jury knew Bontemps was charged with such events, it received evidence regarding those incidents, and it was tasked with evaluating whether those events had been proven beyond a reasonable doubt.

Bontemps further contends that while some expert testimony was permissible to explain V.G.'s failure to report, the broad scope of the expert testimony rendered it irrelevant since the case against him did not involve all topics the expert covered, such as recanting by the witness, allegations of sexual violence, use of pets and finances to control the victim, the preserving of evidence by a victim who was afraid she was going to be killed, and brain damage caused by domestic abuse. The prosecution offered Detective Dominguez's testimony as broad and generalized information about the set of observations and patterns associated with intimate partner battering and its effects. The prosecution did not offer it as testimony that exactly fit the allegations in Bontemps's case, and there was no suggestion by Detective Dominguez or in the prosecution's arguments that everything Detective Dominguez described was true for Bontemps's relationship with V.G. To the contrary, Detective Dominguez testified that he was not assigned to Bontemps's case, had not interviewed V.G., and had no information about V.G.'s case.

We also note that while Detective Dominguez's testimony described behavior by victims that the jury could conclude was consistent with V.G.'s

15

conduct, the expert testimony also supported Bontemps's defense in some regards. Bontemps introduced in his opening statement his defense that V.G and Bontemps were mutual aggressors. The expert testified that the woman is not always the victim, the man is not always the abuser, and that men can be the victims of domestic violence. Detective Dominguez explained that emotional abuse could be committed against men, which corroborated Bontemps's testimony that V.G. constantly belittled and demeaned him. The jury could also view the testimony of the escalation and cycle of violence in a domestic violence relationship as consistent with Bontemps's testimony that V.G. frequently verbally provoked and physically attacked him. Bontemps's effort to take more shifts at work and his offer to pay for V.G. to move away could be seen as consistent with Detective Dominguez's testimony that victims try to get out of an abusive relationship.

The use of the animal imagery did not necessarily prejudice Bontemps, due to defense counsel's effort to adopt the expert testimony and argue it showed Bontemps was the victim. This would mean the terms "bulldog" and "viper" characterized a role occupied not by Bontemps, but by V.G., the real aggressor in the relationship.

The mixed verdict revealed that the jurors neither entirely believed V.G.'s testimony that all of her injuries stemmed from abuse by Bontemps, nor wholly credited Bontemps's defense casting himself as the victim and V.G. as the abuser. In addition to guilty verdicts on several counts of corporal injury and assault, the jury found Bontemps not guilty of the corporal injury charge from February (count 1). As to that encounter, Bontemps admitted he and V.G. had an argument that day, but testified there was no physical altercation, while V.G. testified that Bontemps grabbed her fingers and painfully bent and twisted them, and the prosecution

16

introduced a photograph of her swollen finger. The jury deadlocked on the corporal injury and assault charges from May 13. Bontemps testified that V.G. initiated physical aggression against him on that occasion. He tried to restrain her by hugging her from the back or grabbing her arms, not with the intent to harm or choke her but to end the altercation. V.G. testified about photographs and a video showing bruises to her face, neck, cheeks, chin, and chest inflicted by Bontemps that day.

On this record, we cannot say the expert testimony so inflamed the jury against Bontemps that there was a reasonable probability the result would have been different absent the testimony. (*Strickland, supra,* 466 U.S. at p. 694.)

CALCRIM No. 850 would have informed the jury that, while the expert's testimony about the effects of intimate partner battering relate to a pattern of behavior that may be present in domestic abuse cases, such testimony (1) "is not evidence that the defendant committed any of the crimes charged" and (2) may be considered "only in deciding" if the victim's conduct "was consistent with someone who has been abused and in evaluating the believability of her testimony." (CALCRIM No. 850.) The court's other instructions conveyed substantially the same information. The jurors were instructed that "[i]t is up to all of you, and you alone, to decide what happened." (CALCRIM No. 200.) The jurors could not abdicate that responsibility to the expert. The jurors "alone"—not the expert—"must judge the credibility or believability of the witnesses." (CALCRIM No. 226.) The court instructed the jurors they could believe "all, part, or none of any witness's testimony." (CALCRIM No. 226.) Specific to expert testimony, the jurors were instructed that they were "not required to accept" the expert's opinions "as true or correct," and instead jurors could "disregard any opinion

17

that [they] find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.)

"We presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) Though not tailored to testimony on intimate partner battering, the given instructions provided the same guidance for how the jury could consider evidence. The jury's mixed verdict showed it followed CALCRIM No. 226 and credited Bontemps's testimony in part and V.G.'s testimony in part, which compels our conclusion that Bontemps was not prejudiced by the absence of CALCRIM No. 850.

## IV. *No Cumulative Error*

Having rejected Bontemps's individual claims of error, we find no cumulative error that violated his right to due process and a fair trial.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.